UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

—————————————————————

KEITH WATERS,

                                Plaintiff,

    v.                                          9:18-CV-0196
                                          (MAD/ML)

CATHERINE JACOBSEN, *et al.*,

                                Defendants.

—————————————————————

APPEARANCES:

KEITH WATERS
Plaintiff, *pro se*
79 North Oxford Walk
#13F
Brooklyn, NY 11206

HON. LETITIA JAMES                  JOHN F. MOORE, ESQ.
Attorney General for the             Assistant Attorney General
State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**MIROSLAV LOVRIC**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff *pro se* Keith Waters ("Waters" or "Plaintiff"), an inmate who was, at all relevant

times, in the custody of the New York Department of Corrections and Community

Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants

———————————————

[1]      This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

for violations of his constitutional rights.  Dkt. No. 32 ("Sec. Am. Compl.").  Presently before the Court is Defendants' motion for summary judgment and dismissal of Waters' Second Amended Complaint pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.  Dkt. No. 80.  Waters did not oppose the motion.  For the following reasons, it is recommended that Defendants' motion for summary judgment be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Failure to Respond

Before discussing the background of this case, the Court addresses the fact that Waters failed to respond or oppose the motion.  The Second Circuit requires that a pro se litigant defending against a summary judgment motion be notified as to the nature and consequences of summary judgment.  *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620–21 (2d Cir.1999); *see also* Local Rule 56.2 (Notice to Pro Se Litigants of the Consequences of Failing to Respond to a Summary Judgment Motion).  Here, Waters was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court.  Dkt. No. 80 at 4; Dkt. No. 82.  Given this notice, Waters was adequately apprised of the pendency of Defendants' motion and the consequences of failing to respond.  On October 2, 2019, Waters requested an extension of time to file his response to the motion and permission to exceed the page limit.  Dkt. No. 83.  The Court granted the extension and directed Waters to provide a response on or before October 31, 2019.  Dkt. No. 84.  Despite the extension, Waters has not submitted opposition to Defendants' motion for summary judgment.

"The fact that there has been no response to a summary judgment motion does not . . .

mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). The Court has broad discretion to decide whether to overlook the parties' failures and perform an independent review of the record. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Jackson v. Fed. Exp.,* 766 F.3d 189, 194 (2d Cir. 2014) (noting that "the court may rely on other evidence in the record even if uncited" in determining the undisputed material facts). If the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit in opposing a motion for summary judgment. *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir.2004).

Here, because the Second Amended Complaint is verified, *see* Dkt. No. 32 at 47, the Court will accept the pleading as an affidavit to the extent that the statements are based on Waters' personal knowledge or are supported by the record. *See Berry v. Marchinkowski*, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude). Additionally, the facts may be collected from Waters' deposition testimony, sworn testimony presented during disciplinary hearings, and other documents included in the record. *See* Dkt. No. 80-2 at 266-289; Dkt. No. 80-3 at 3-19; Dkt. No. 80-5.

Due to Waters' pro se status, the Court has opted to review the entire summary judgment record to ascertain the undisputed material facts. Consequently, the facts set forth

in Defendants' Rule 7.1 Statement of Material Facts[2] are accepted as true as to those facts

that are not disputed by the facts set forth in the Complaint.  N.D.N.Y. L.R. 7.1(a)(3) ("The

Court shall deem admitted any properly supported facts set forth in the Statement of Facts

that the opposing party does not specifically controvert.") (emphasis omitted).

### B. Facts[3]

At the time of the incidents described in the Second Amended Complaint, Waters was an

inmate in the custody of DOCCS and confined at Wallkill Correctional Facility ("Wallkill

C.F.").  *See generally*, Dkt. No. 32.

In 2006, Waters was convicted of robbery in the first degree.  *See*

---

[2]     Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorneys' affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.  The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.  The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3).

[3]     Defendants annexed exhibits to the motion.  Dkt. Nos. 80-2 through 80-12.  Plaintiff does not object or challenge the authenticity of the documents.  Therefore, the Court will consider the exhibits in the context of the within motion.  *See U.S. v. Painting known as Hannibal*, No. 07-CV-1511, 2010 WL 2102484, at *1, n.2 (S.D.N.Y.  May 18, 2010) (citing *Daniel v. Unum Provident Corp.*, 261 F. App'x 316, 319 (2d Cir.  2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)).  In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

http://nysdoccslookup.doccs.ny.gov (last visited January 29, 2020).    In June 2015, Waters

was transferred to Wallkill C.F. and assigned the job of Inmate Law Library Clerk.  Dkt. No.

32 at 7.[4]  At the relevant time, defendant Christopher Wlodkowski ("Wlodkowski") was the

Law Library Officer.  Dkt. No. 80-8 at ¶3.

On January 10, 2016, Waters deposited a 9 x 12 envelope in the facility mailbox slot

located outside the P.C. Unit.  Dkt. No. 80-5 at 38.  The envelope was addressed to Ms.

Carmen Sheard ("Sheard") and contained a twenty-three page typewritten document and a

note to Ms. Sheard.[5]  Dkt. No. 80-2 at 286; Dkt. No. 80-5 at 34.  Waters did not present the

envelope to any officer for inspection prior to placing it in the mailbox and he did not retain a

copy of the contents of the envelope.  *Id*. at 35, 40, 41.  Waters did not mark the envelope as

"legal mail."  Dkt. No. 80-2 at 286.

On January 11, 2016, at approximately 12:30 p.m., defendant Lieutenant William Purdy

("Purdy") received Waters' oversized, sealed envelope in the mail room.  Dkt. No. 80-12 at ¶

5.  Because the envelope was not a standard business envelope or marked as legal mail,

Purdy determined that the envelope should have been searched prior to being sealed.  *Id*.

Purdy claims that received permission from Jacobsen to open the envelope.[6]  Dkt. No. 80-2

at 262.  Upon inspection of the contents of the envelope, Purdy issued an Inmate

Misbehavior Report, dated January 11, 2016 ("January 2016 MBR"), charging Waters with

---

[4]        Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

[5]        Waters describes the document as a "manuscript" detailing illegal activity including sexual assault, harassment, and excessive force by staff members at Wallkill C.F. and the "Department of Corrections in general."  Dkt. No. 32 at 8; Dkt. No. 80-5 at 34.

[6]        Waters disputes this contention.

5

violating Rules 180.11[7] and 180.17.[8]  *Id.* at ¶ 5, 262.  Purdy wrote:

> On the above date and approx time, an envelope was brought up to me from the mail room.  This envelope was an oversized, which should have been opened by the officer at P.C. and inspected for contraband before it was sent out.  This envelope was from Inmate Waters 06A2999 and was being sent to a Mrs. Carmen Sheard in Staten Island.  Recently, we had an Inmate Sheard that had been transferred to Fishkill on 12/8/15.  Permission to open and inspect the envelope was granted by Supt. Jacobsen.  Inside the envelope was legal work with a note to Mrs. Sheard, stating that he had heard her husband will not be coming back to Wallkill so he is sending the completed work.  This work was legal work which encompassed advise [sic] on several different issues of his case, which included what direction should be taken on his case.  This paperwork was clearly sent to Mrs. Sheard so that it could be kited to Inmate Sheard who is at Fishkill C.F.  Inmate Waters is in violation of both 180.11 facility correspondence, due to a third party mailing and also 180.17 for providing legal assistance to an inmate who no longer is at Wallkill C.F.  Envelope and all contents have been confiscated and secured in evidence locker.[9]

Dkt. No. 80-2 at 262.

---

[7]    Rule 180.11 provides:

An inmate shall comply with and follow the guidelines and instructions given by staff regarding facility correspondence procedures pursuant to requirements of departmental Directive Nos. 4422 and 4421.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2.

[8]    Rule 180.17 provides:

An inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2.

[9]    Waters testified that Ms. Sheard's husband, a former inmate at Wallkill C.F., was transferred to Fishkill Correctional Facility, but asserts that the documents were not legal materials related to Mr. Sheard.  Dkt. No. 80-5 at 70-71.  Waters contends that he forwarded the documents to Ms. Sheard because she "was a friend."  *Id.*

On January 20, 2016, defendant Lieutenant Ian Huckeba ("Huckeba") presided over a Tier II Disciplinary Hearing related to the January 2016 MBR. Dkt. No. 80-2 at 266. Waters pleaded "not guilty" to the charges and claimed that the mail room staff violated Directive #4422 ("Dir. #4422").[10]  *Id.* at 267-268. Waters conceded that while Paragraph (III)(B)(8) directed an inmate to present outgoing correspondence that could not be enclosed in a standard size envelope for inspection by a designated security staff person, Paragraph (III)(B)(22) also provided that correspondence that does not comply with the directive shall be opened and returned to the offender with an explanation for the return. *Id*. at 268. Thus, Waters argued that, based upon Dir. #4422, the January 2016 correspondence should have been returned to him, rather than opened and confiscated. *Id*.

During the hearing, defendant Wallkill C.F. Superintendent Catherine Jacobsen ("Jacobsen") testified that she provided verbal authorization to open the oversized mailing, but not written authorization.[11] Dkt. No. 80-2 at 279. Waters asked Huckeba to read the entire twenty-three pages into the record and argued that Purdy's misbehavior report misrepresented the documents. *Id*. at 269. Huckeba refused, but read the contents of the note addressed to Mrs. Sheard.[12] Dkt. No. 80-2 at 269, 273. The note read, "Mrs. Sheard I was told that your husband will be in the SHU until April 2016 based on that he probably will not return to this facility therefore, I am sending the work completed." *Id*. Waters testified

---

[10]     DOCCS' Directive #4422 ("Dir. #4422") set forth the policies and procedures governing the offender's correspondence program. Dkt. No. 80-6 at 80-91. Dir. #4422 is discussed at length, *infra*.

[11]     Waters disputes this contention and testified that "she never gave [Purdy] authorization, period." Dkt. No. 80-5 at 50-51.

[12]     The name Sheard and Shearer are used, interchangeably, throughout the record. The Court will refer to the individual as "Sheard."

that the twenty-three page document included "legal arguments." *Id*. at 286.

Relying upon the January 2016 MBR, the note to Mrs. Sheard, the contents of the envelope, and Waters' testimony, Huckeba found Waters guilty of both charges. Dkt. No. 80-2 at 259, 260, 287. The confiscated mail was placed in a contraband locker, to be destroyed at a later date. Dkt. No. 80-2 at 401, ¶ 18.

On January 20, 2016, Waters appealed Huckeba's determination. Dkt. No. 80-2 at 291; Dkt. No. 80-5 at 63-64. Waters argued that Huckeba was biased and relied upon insufficient evidence. Dkt. No. 80-2 at 291. Waters also claimed that "the disposition was in retaliation of activity under the First Amendment." *Id*. On January 21, 2016, defendant Deputy Superintendent of Security G. Niles ("Niles") affirmed Huckeba's determination. *Id*. Waters challenged the disciplinary determination in an Article 78 proceeding. Dkt. No. 80-5 at 331; *see Waters v. Purdy*, 149 A.D.3d 144 (3d Dep't 2017).

Two days after Niles issued his decision, Wlodkowski informed Waters that he was discharged from his position as the Facility Law Library Clerk. Dkt. No. 32 at 11; Dkt. No. 80-5 at 323. One week after Niles issued his decision, Waters spoke with him in the law library. Dkt. No. 80-5 at 321-322. Niles told Waters that he "carefully reviewed the hearing tape and confiscated document to find th[at] Huckeba's decision was appropriate." *Id*. at 322. Waters asked Niles why he was removed from his position at the law library and Niles responded that Waters' presence as a clerk in the law library posed a risk to safety and security. *Id*. at 322-325.

On February 24, 2016, Waters submitted a written request to Jacobsen for a copy of a misbehavior report issued by Purdy on February 2, 2016 to Inmate Teddy Jeudy ("Jeudy").

8

Dkt. No. 80-3 at 160.  The misbehavior report charged Jeudy with violating Rule 180.11.  *Id*.

In the request, Waters indicated that he intended to raise retaliation and equal protection

claims and that Jeudy's documents supported his claims.  *Id*.  On February 25, 2016,

Jacobsen denied the request reasoning:

> Based on the fact that the misbehavior report you received was
> for possessing another inmates papers without permission, I
> am not inclined for you to be approved to possess inmate
> Jeudy's papers or any other inmates papers.

Dkt. No. 80-3 at 161.

On August 8, 2016, Waters sent a second request to Jacobsen for Jeudy's misbehavior

report.  Dkt. No. 80-3 at 162.  On August 10, 2016, Niles denied the request.  *Id.* at 163.

On August 12, 2016, Jeudy forwarded an affidavit to Jacobsen.  Dkt. No. 80-6 at ¶ 31.  The

affidavit, which was notarized by Wlodkowski, authorized two Judges of the Northern District

"or any legal representative of any plaintiff involved in litigation in such court to have access

to all [of] my DOCCS inmate disciplinary program history record[.]" Dkt. No. 80-3 at 165; Dkt.

No. 80-5 at 107.  On August 23, 2016, Jacobsen denied Jeudy's request and advised that

"Mr. Waters['] attorney can ask for documents he may need." Dkt. No. 80-6 at 101.

On September 12, 2016, Waters filed an Inmate Claim Form seeking $5,000.00 for

"twenty-three pages of written material of a legal nature confiscated by Lt. Purdy." Dkt. No.

80-2 at 293.  The claim was denied and Waters appealed the determination to Jacobsen.  *Id*.

at 294.  Jacobsen denied the appeal because Waters, "failed to provide documentation to

prove value.  Also the documents were not his and were part of a disciplinary hearing." *Id*.

On January 18, 2017, Jacobsen administratively reversed and expunged the disciplinary

determinations related to the January 2016 MBR and hearing.[13]  Dkt. No. 32 at 15, 20; *see also Waters*, 149 A.D.3d at 1444.  Jacobsen did not respond to Waters' request to return the contents of the envelope.  Dkt. No. 32 at 15.

On February 16, 2017, Wlodkowski issued a misbehavior report (the "February 2017 MBR") charging Waters with violating Rules 113.15[14], 113.23[15], and 180.17 related to unauthorized exchange, legal assistance, and possessing contraband.  Dkt. No. 80-3 at 184. Wlodkowski reported:

> On the above date and approximate time, I CO Wlodkowski was making rounds in the law library.  I stopped at inmate Waters 06A2999 who was in law library typing.  I told inmate Waters I needed to see what he was working on to ensure it was legal work.  He stated "I'm working on my legal work."  I stated "what is that work sitting there on your right?"  He picked it up and quickly showed it to me.  I then told him to give it to me.  In which he complied.  Upon inspecting it I found three affidavits with inmate Simon Carter's name on them.  I asked inmate Waters what he was doing with these?  He stated "I was helping Carter out by looking them over."  I told Waters that he is NOT a law library clerk and does NOT have

---

[13]    In the Second Amended Complaint, Plaintiff alleges that Jacobsen expunged his record in January 2017.  Dkt. No. 32 at 15, 20.  On April 27, 2017, the Appellate Division issued an Order dismissing the Article 78 petition as moot after the Attorney General advised that the determination was administratively reversed.  *See Waters*, 149 A.D.3d at 1444.  Defendants do not dispute or confirm the date of the reversal or that Jacobsen reversed the determination.

[14]    Rule 113.15 provides:

An inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2.

[15]    Rule 113.23 provides:

In addition to those items of contraband specifically identified by this rule series, an inmate shall not possess any item unless it has been specifically authorized by the superintendent or designee, the rules of the department or the local rules of the facility.

N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2.

> authorization to possess or to be doing work for other inmates. I confiscated the three affidavits, and issued a contraband receipt. I ordered inmate Waters to report back to his housing unit. I then notified my area supervisor and issued a misbehavior report and contraband placed in contraband locker.

Dkt. No. 80-3 at 184.

On February 28, 2017, Purdy presided over a Tier II disciplinary hearing related to the February 2017 MBR. Dkt. No. 80-3 at 180. During the hearing, Waters asked for a different hearing officer explaining to Purdy that, "a year ago, you wrote me up for the exact same thing." Dkt. No. 80-4 at 9. Purdy denied the request. *Id*. at 10. Waters testified that he titled the confiscated material, "affidavit," and admitted that while it was not a legal document, "it was gonna become [a legal document]." Dkt. No. 80-4 at 5-6. Waters testified that he created the document because he knew that Wlodkowski would search his paperwork. *Id*. at 8. Purdy read the document into the record:

> . . . Simon Carter being duly sworn deposes and says that I am a male inmate currently incarcerated at the Wallkill Correctional Facility [in DOCCS]. I am six feet tall approximately two hundred ten pounds, black hair light skinned complexion thirty seven years of age. I have two visibly distinctive tattoos in the inside and outside of my right lower forearm. In 2015 I was incarcerated at Rikers Island in the City of New York Department of Corrections in my normal usual dress style wearing short sleeve shirts to display the two tattoos in my right lower forearm area. On several occasions while incarcerated at Rikers Island I received legal mail and had to report to the facility mail package room and sign my name in a bound paginated ledger [] before receiving my legal mail. Upon information and belief Rikers Island did not distribute legal mail on Saturdays. Upon the information, I believe the agency maintained documents and photographs of the tattoos on the inside and outside of my lower right forearm. I was not served civil process papers on a Saturday at RIkers Island by corrections Captain Branwell of the facility mail package room. Or any other area of the facility I did not sign my name in a

11

> bound paginated ledger as receiving legal mail. Upon information or belief Correctional Captain Branwell is not an authorized person to deliver legal mail, civil process papers at Rikers Island and did not serve civil process papers in an authorized manner.

Dkt. No. 80-4 at 13.

Waters testified that the entire affidavit was fictitious, except for the inmate's name and the fact that the inmate had tattoos. Dkt. No. 80-4 at 13.

Relying upon the February 2017 MBR and testimony by Wlodkowski and Waters, Purdy found Waters guilty of violating rules related to contraband and legal assistance. Dkt. No. 80-3 at 181.

In March 2018 and April 2018, Waters met with defendant Offender Rehabilitation Coordinator ("ORC") S. Levandoski ("Levandoski") to prepare for his pending release. Dkt. No. 80-5 at 155, 158.

On April 17, 2018, Waters and Levandoski executed form 9601aCS entitled "Pre-Release Notice to Individuals Subject to Community Supervision Regarding Requests to Have Parental Contact with Biological/Adopted Minor Child(ren) When a Condition of Supervision is Contemplated or Has Been Imposed" ("Pre-Release Notice"). Dkt. No. 80-10 at 27. The pre-printed form advised Waters that he could make a written request to his Parole Officer for permission to contact his child. *Id*. at ¶ 7.

On May 1, 2018, the Office of Children and Family Services ("OCFS") forwarded a letter to Waters in response to his request for information on "Subject Name: Keith Waters." Dkt. No. 32 at 200. Waters was advised:

> We have conducted a search of the SCR (New York State Central Register) database based on the information which you have provided. We do not find the individual(s) listed below, to

12

be named in any report on file in the State Central Register.

Dkt. No. 32 at 200.

On July 19, 2018, Waters was released from prison. Dkt. No. 80-5 at 18. As a condition of his release, Waters was instructed not to associate, in any way, or communicate, by any means, with his wife, Sharon Waters and his daughter, Kierah Waters, without the permission of his parole officer. Dkt. No. 32 at 198.

### C. Procedural History

On February 15, 2018, the Court received the Complaint in the within action. Dkt. No. 1. On August 8, 2018, the Court granted Plaintiff's motion to amend and accepted the Second Amended Complaint as the operative pleading. Dkt. Nos. 31 and 32. Upon review of the Second Amended Complaint, the Court directed Defendants to respond to the following claims: (1) Fourth Amendment and First Amendment claims against Jacobsen and Purdy related to the seizure of Waters' outgoing mail in January 2016; (2) First Amendment retaliation claims: (a) against Purdy, Huckeba, Niles, and Wlodkowski related to the January 2016 MBR and February 2017 MBR and the subsequent disciplinary proceedings and appeals; (b) against Wlodkowski and Niles related to Waters' removal from his position as law library clerk; (c) against Jacobsen and Niles related to Waters' request for Jeudy's records; and (d) against Jacobsen related to the unconstitutional application of Rules 113.23 and 120.17, the opening of his January 2016 mail, and denial of Waters' facility claim; (3) claims for injunctive and declaratory relief against Annucci in his official capacity related to Rules 113.27, 180.27, and 113.23 ; and (4) Fourteenth Amendment due process claims related to the special conditions of parole against Annucci, Jacobsen, and Levandoski. *See generally,* Dkt. No. 31.

13

On October 1, 2018, Annucci, Huckeba, Jacobsen, Levandoski, Purdy, and Wlodkowski filed an Answer to the Second Amended Complaint.[16] Dkt. No. 49. On April 15, 2019, Niles filed an Answer to the Second Amended Complaint.[17] Dkt. No. 67. On December 31, 2018 and June 20, 2019, Waters was deposed. Dkt. No. 80-5. On September 20, 2019, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to Waters' claims. Dkt. No. 80.

## II. LEGAL STANDARD

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 317, 248 (1986).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56; *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a

---

[16]    In the Answer, Defendants pleaded, *inter alia*, the affirmative defense that Waters failed to exhaust his administrative remedies. Dkt. No. 49 at ¶ 22.

[17]    In the Answer, Defendant pleaded, *inter alia*, the affirmative defense that Waters failed to exhaust his administrative remedies. Dkt. No. 67 at ¶ 22.

documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.

1994). To that end, sworn statements are "more than mere conclusory allegations subject to

disregard . . . they are specific and detailed allegations of fact, made under penalty of

perjury, and should be treated as evidence in deciding a summary judgment motion" and the

credibility of such statements is better left to a trier of fact. *Scott*, 344 F.3d at 289 (citing

*Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872

(2d Cir. 1995)).

All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). Furthermore, where,

as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant

special solicitude. *See Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir.

2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is
> entitled to "special solicitude," . . . that a pro se litigant's submissions must
> be construed "liberally,". . . and that such submissions must be read to
> raise the strongest arguments that they "suggest," . . . . At the same time,
> our cases have also indicated that we cannot read into pro se submissions
> claims that are not "consistent" with the pro se litigant's allegations, . . . or
> arguments that the submissions themselves do not "suggest," . . . that we
> should not "excuse frivolous or vexatious filings by pro se litigants," . . . and
> that pro se status "does not exempt a party from compliance with relevant
> rules of procedural and substantive law.

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d

185, 191–92 (2d Cir. 2008). Nonetheless, summary judgment is appropriate "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the non-moving

party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## III.  DISCUSSION[18]

Defendants move for summary judgment arguing that Waters failed to exhaust his administrative remedies through available grievance procedures prior to the commencement of this action with respect to the following claims: (1) retaliation claims against Wlodkowski and Purdy related to the February 2017 MBR and disciplinary hearing; and (2) Fourteenth Amendment claims against Annucci related to conditions of parole.  *See* Dkt. No. 80-14 at 12.  Defendants also move for summary judgment and dismissal of the following: (1) Fourth Amendment claims and First Amendment free speech claims; (2) all retaliation claims; (3) claims for injunctive and declaratory relief against Annucci; and (4) claims related to special conditions of parole.  *See id.* at 12-31.  In the alternative, Defendants argue that they are entitled to qualified immunity.  *See id.* at 35-36.

### A.  Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo*, 548 U.S. 81, 82 (2006).  The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages.  *Id*. at 524.

---

[18]     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to Plaintiff.

To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation omitted).

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program ("IGP"). N.Y. Comp. Codes R. & Regs. title 7, § 701.5 (2015). First, the inmate must file a complaint with Inmate Grievance Program ("IGP") clerk within twenty-one days of the alleged action. *Id*. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. *Id*. at § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. *Id*. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the Inmate Grievance Resolution Committee's ("IGRC") determination to the facility superintendent within seven calendar days of receipt of the determination. *Id*. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. *Id*. §§ 701.5(d)(1)(i)-(ii). If a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC. *Id*. at § 701.5(d)(3)(i). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." *Id*. § 701.5(d)(3)(ii). Only upon

17

exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F.Supp.2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter,* 534 U.S. 516.

Where the grievance involves allegations of employee harassment, there is an expedited administrative process. *See* N.Y.C.R.R. title 7, § 701.8; *see Torres v. Carry*, 691 F.Supp.2d 366, 369–70 (S.D.N.Y. 2009). Complaints and grievances of this nature are forwarded directly to the superintendent of the facility. *Bell v. Napoli*, No. 9:17-CV-850 (ATB), 2018 WL 6506072, at *2 (N.D.N.Y. Dec. 11, 2018). In such cases the superintendent is required to order an investigation and render a decision within twenty-five (25) days. *See* N.Y.C.R.R., title 7, § 701(a)-(f). If the superintendent fails to respond within the required twenty-five (25) day time limit the inmate may appeal his grievance to the CORC. Disagreement with the superintendent's decision in the expedited review process also requires an appeal to the CORC. *Id.* § 701.8-(g)-(h); *see also Espinal v. Goord,* 588 F.3d 119,125 (2d Cir. 2009) (explaining IGP and the expedited procedure for harassment claims and its appeal mechanism through the CORC). The Second Circuit has long recognized this procedure as an "available remedy" for purposes of the PLRA. *See Hall v. County of Saratoga*, No. 10–CV–1120 (NAM/CFH), 2013 WL 838284, at *1–2 (N.D.N.Y. Mar. 6, 2013).

Defendants bear the burden of establishing that a prisoner failed to satisfy the exhaustion requirement. *See Jones*, 549 U.S. at 216.

At the time of the incidents that give rise to this action, Wallkill C.F. had a grievance program that Waters was familiar with, having filed "numerous" grievances. Dkt. No.80-5 at

18-19.

### 1. Claims Against Wlodkowski and Purdy

Defendants argue that Waters failed to exhaust his retaliation claims against Wlodkowski and Purdy related to the February 2017 MBR and subsequent disciplinary hearing because he failed to appeal the disciplinary determination or complete the grievance process.  Dkt. No. 80-14 at 12.

DOCCS maintains a separate review process for inmate appeals of disciplinary hearings. *Davis v. Barrett*, 576 F.3d 129, 132 (2d Cir. 2009)  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.3(e)(1)-(2) (2010) ("An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.").  A disciplinary appeal is sufficient to exhaust a claim that an inmate was deprived of due process at a disciplinary hearing.  *See Thomas v. Delaney*, No. 9:17-CV-1023 (GLS/CFH), 2019 WL 4247807, at *10 (N.D.N.Y. Aug. 13, 2019) (collecting cases).  However, "allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved.  *Id*. (citing *Crosby v. LaValley,* No. 9:15-CV-1125 (BKS/ATB), 2017 WL 7050647, at *6 (N.D.N.Y. Dec. 15, 2017) (finding that retaliation claims related to misbehavior report were not properly exhausted due to the absence of any reference to retaliation in disciplinary hearing transcript or grievances).

With respect to Waters' retaliation claim against Wlodkowski, the "retaliatory filing of a false misbehavior report plainly does not qualify as [ ] a 'decision or disposition' " resulting from a disciplinary proceeding.  *Waters v. Melendez*, 783 F. App'x 56, 59 (2d Cir. 2019) (citation omitted).  Accordingly, the appeal of a disciplinary hearing does not exhaust this

19

claim.  With respect to Purdy, the Second Amended Complaint does not include Fourteenth

Amendment due process claims related to the February 2017 disciplinary hearing.  Rather,

Waters alleges that Purdy retaliated against him when he found him guilty of the charges

contained in the false report.  As such, the filing of a disciplinary appeal would not satisfy the

exhaustion requirement for this claim.  *See Waters v. Melendez*, No. 15-CV-0805

(TJM/CFH), 2018 WL 3079764, at *8 (N.D.N.Y. May 18, 2018) (citation omitted) *aff'd*, 783 F.

App'x 56 (2d Cir. 2019) (holding that an inmate asserting both retaliation claims and

procedural due process claims must separately exhaust both types of claim, using the

procedure appropriate to each type of claim).  Moreover, even assuming that an appeal of

the disciplinary hearing satisfied the exhaustion requirement for either retaliation claim, the

record lacks any evidence establishing that Waters appealed Purdy's disciplinary

determination.[19]

On March 7, 2017, Waters filed a grievance (WK 11484-17) complaining that

Wlodkowski and Purdy delayed his legal mail, restricted his access to the law library, and

used the disciplinary process to retaliate against him.  Dkt. No. 80-4 at 22-23.  Waters

demanded that "the harassment and retaliation [ ] cease."  *Id*. at 23.  Purdy and Wlodkowski

were involved in the investigation and issued memoranda.  *Id*. at 25.  Purdy "denied using

the disciplinary mechanisms as retaliation for anything."  Dkt. No. 80-4 at 25.  Wlodkowski

asserted "that he used a true and accurate misbehavior report for rule violations."  *Id*. at 25,

27, 28.

---

[19]    During his deposition, Waters claimed that he appealed Purdy's decision, *see* Dkt. No. 80-5 at
146, that assertion however, is unsupported by competent, admissible evidence.

On March 22, 2017, the Inmate Grievance Resolution Committee ("IGRC") dismissed the grievance finding that Waters was seeking "a decision or an appeal of a decision otherwise attainable through the disciplinary process." Dkt. No. 80-4 at 37.  Waters did not appeal the IGRC's determination.  Dkt. No. 80-5 at 149-150.

Based upon the record before the Court, Defendants have met their burden of showing that Waters failed to exhaust his administrative remedies with respect to his First Amendment retaliation claims against Wlodkowski and Purdy related to the February 2017 MBR and disciplinary hearing.  Waters does not allege that he failed to meet the exhaustion requirement due to administrative remedies being unavailable to him. Indeed, during his deposition, Waters was asked if he appealed WK 11484-17 and testified, "I normally appealed everything because everything was denied, so - - oh, no, I didn't.  Actually I didn't." Dkt. No. 80-5 at 150.  Waters offered no explanation or excuse for his failure to appeal to CORC.   Further, Waters is a frequent litigator and "no stranger to the IGP" and has not presented any argument or claim that he construed the disciplinary appeal process as a substitute for completing the grievance process.  *See Dabney v. Pegano*, 604 Fed. App'x 1, 5 (2d Cir. 2015).

Accordingly, it is recommended that Defendants' motion on this ground be granted.

### 2.  Claim Against Annucci

Defendants argue that Waters did not fully exhaust his administrative remedies related to his Fourteenth Amendment claim against Annucci because Waters made "no mention of any acts by Defendant Annucci" in his grievances on the issue of parole.  *See* Dkt. No. 80-14 at 12.

21

"The New York IGP regulations do not state that a prisoner's grievance must name the responsible party." *Espinal*, 558 F.3d at 126.  "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." *Id.* (citing N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7(a)(1)(i)).  Thus, "a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies." *Id.*  To satisfy the exhaustion requirement, "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).

On April 24, 2018, Waters filed a grievance (WK-11679-18) claiming that Levandoski imposed a recommendation that he not be permitted to associate with his daughter or wife as a condition of parole, without providing Form 9601aCS as required under Directive #9601 ("Dir. 9601").[20]  Dkt. No. 80-4 at 67.  Waters asked for a copy of the form and for the suspension of the application and enforcement of Dir. #9601.  *Id.*  As part of the investigation, Levandoski issued a memorandum explaining that the form could be "foiled, or provided upon his release."  *Id*. at 73.

---

[20]    Dir. #9601 - Parental Contact Protocol, provides, in pertinent part:

II.  Written Notice to Individuals Expected to Be Under or Under Community Supervision
Every individual scheduled to be reviewed by DOCCS staff on a pre-Board basis, and again at the time of their release, will be provided with written notice regarding the ability and attendant process for requesting the exercise of certain parental rights while under community supervision.  Written notice shall also be provided by DOCCs staff to a releasee whenever conditions modifying, limiting, or prohibiting Parental Contact are subsequently imposed.  this notice shall describe a releasee's eligibility for requesting Parental Contact (PC) approval from DOCCS and how such requests are to be processed, investigated, and determined, see Form #9601aCS, "Pre-Release Notice."

Dkt. No. 32 at 152.

On May 3, 2018, the IGRC recommended that Waters be provided with the form "if he is allowed to possess it." Dkt. No. 80-4 at 75. With respect to Waters request for a directive "change," the committee concluded, "we don't see a need for the change at this time." *Id*. Waters appealed to the Superintendent. *Id.* On May 7, 2018, Jacobsen denied the grievance and advised that the ORC recommended conditions based upon the grievant's record. *Id*. at 76. Moreover, Form 9601aCS "does not state that a copy be given to the offender before his release. There is a challenge procedure in place when a condition of limiting or prohibiting contact has been imposed by Community Supervision." Dkt. No. 80-4 at 76. Jacobsen also indicated that she saw "no reason to change Directive #9601 - Parental Consent Protocol - at this time." *Id*. Waters appealed to CORC.[21] *Id*.

On May 28, 2018, Waters filed a grievance (WK-11689-18) claiming that the special conditions of parole were imposed for the purpose of harassment and retaliation. Dkt. No. 80-4 at 51. The IGRC denied the grievance noting that the "ORC completed the paperwork correctly." *Id*. at 52. Waters appealed to the Superintendent. *Id.* On June 12, 2018, Jacobsen denied the grievance and advised Waters to "FOIL the names of the commissioners who imposed the stipulations." *Id*. at 55. Waters appealed the determination to CORC.[22] Dkt. No. 80-4 at 55.

With this motion, Defendants provided the grievance records related to the aforementioned complaints, including documents memorializing the investigation, and written responses. It is clear from the record that Defendants were provided with sufficient

---

[21]    The record does not include a response from CORC.

[22]    The record does not include a response from CORC.

information, in both grievances, to allow them to fully investigate and respond to Waters' complaints. The Second Circuit has held that the failure to specifically name a party in a grievance, without more, does not warrant an award of summary judgment. *See Zappulla v. Annucci*, 636 Fed. App'x 824, 825 (2d Cir. 2016) (reversing the lower court award of summary judgment and dismissal of claims against Annucci based on a finding that the plaintiff failed adequately to exhaust administrative remedies because he did not specifically name Annucci in his administrative complaint); *see also Brownell v. Krom*, 446 F.3d 305, 311 (2d Cir. 2006) (reasoning that naming a defendant in a grievance is not necessary to give prison officials notice sufficient to resolve the grievance). Defendants present no alternative argument in favor of an award of summary judgment to Annucci based upon exhaustion. Accordingly, the Court recommends that this portion of Defendants' motion be denied.

## B. First Amendment - Freedom of Speech and Fourth Amendment

Defendants move for summary judgment and dismissal of Waters' First Amendment and Fourth Amendment claims against Purdy and Jacobsen arguing that Defendants had "reasonable cause" to open and confiscate Waters' mail. Specifically, Defendants contend that they reasonably applied the policies and procedures set forth in Dir. #4422 and had a legitimate penological interest in preventing the mailing of contraband. *See* Dkt. No. 80-14 at 13-15.

"[T]he Supreme Court has told us that inmates do not abandon their constitutional rights at the prison door." *Pabon v. Wright*, 459 F.3d 241, 249 (2d Cir. 2006). The interception of a prisoner's mail has been analyzed under both the First and Fourth Amendments. *United States v. Felipe*, 148 F.3d 101, 108 (2d Cir. 1998). The First Amendment protects a

prisoner's right to the free flow of incoming and outgoing mail. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). "[G]reater protection [is afforded] to outgoing mail than to incoming mail." *Id*. (citations omitted). The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures[ ] shall not be violated." U.S. Const. amend. IV. However, "it must be recognized that a prisoner's constitutional rights are limited by the legitimate penological needs of the prison system." *Felipe*, 148 F.3d at 107 ("[I]interception of [an inmate's] prison correspondence does not violate that individual's First or Fourth Amendment rights if prison officials had 'good' or 'reasonable' cause to inspect the mail."). "In determining whether a restriction is constitutionally permissible, the court must consider: (1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates, and prison resources generally; and (4) whether obvious, easy alternatives to the restriction exist." *Dillhunt v. Theriault*, No. 9:07-CV-0412 (GTS/DEP), 2009 WL 4985477, at *10 (N.D.N.Y. Dec. 15, 2009) (citing *Purnell v. Lord*, 952 F.2d 679, 683 (2d Cir.1992)). "The investigation and prevention of ongoing illegal inmate activity constitute legitimate penological objectives." *U.S. v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996). Non-legal, outgoing mail may be open and read by prison officials with, "good cause." *Minigan v. Irvin*, 977 F.Supp. 607, 609 (W.D.N.Y. 1997) (citations omitted).

At the relevant time, Dir. #4422 set forth the policies and procedures governing the offender's correspondence program. Dkt. No. 80-6 at 80-91. Pursuant to Dir.

#4422(III)(B)(8), general oversize correspondence is defined as "mail which cannot be enclosed in a standard business envelope[.]" *Id*. at 82. Oversize correspondence, "shall be inspected in the presence of the offender by a designated security staff person for the presence of contraband." *Id*. After inspection, "[l]egitimate correspondence may be sealed by the offender [. . . ], and the inspecting staff person shall then sign the back of the envelope or parcel certifying inspection[.]" *Id*.

Dir. #4422(III)(B)(21) defines the practice known as "kiting." Dkt. No. 80-6 at 83. Specifically, offenders are prohibited from "includ[ing] any written material in outgoing mail not specifically intended for the addressee identified on the exterior of the envelope. " *Id*. Moreover, "an offender shall not include in outgoing mail any written material for an offender not specifically identified as the sender on the exterior of the envelope." *Id*. Kiting may result in disciplinary action. *Id.*

Courts in this Circuit have upheld Dir. #4422 and DOCCS' policy and procedure for inspection of outgoing inmate correspondence as reasonably related to legitimate penological interests. *Minigan*, 977 F.Supp. at 609 (citations omitted).

In support of the motion, Jacobsen and Purdy provided Declarations. *See* Dkt. No. 80-6; Dkt. No. 80-12. Purdy states that he was working in the mailroom on January 11, 2016 when he was presented with an oversized, sealed envelope. Dkt. No. 80-12 at ¶ 5. Jacobsen attests that, upon request, she provided verbal authorization to Purdy to confiscate and open the sealed, oversized, outgoing mail envelope. Dkt. No. 80-6 at ¶ 14. Jacobsen explains that the opening of the envelope was justified based on Waters failure to comply with Dir. #4422. *Id*. at ¶ 20. Jacobsen avers, "[a]ttempting to mail an oversized envelope without prior

inspection meant Plaintiff was circumnavigating the correspondence program and was breaching security guidelines set forth in Directive 4422[]" and is a violation of Dir. #4422(III)(B)(21).  Dkt. No. 80-6 at ¶¶ 14, 20.

Upon inspection of the contents of the envelope, Purdy determined that Waters was attempting to mail twenty-three pages of unauthorized legal work to the family of another inmate in another correctional facility.  Dkt. No. 80-6 at ¶ 16; Dkt. No. 80-12 at ¶ 6.  Purdy concluded that Waters was engaged in "kiting," issued a misbehavior report, and confiscated the envelope and its contents.  *Id*. at ¶7.

Waters argues that Defendants did not have good cause to open his mail because they failed to adhere to Dir. #4422(III)(B)(9).[23] Dkt. No. 80-5 at 45.  Waters contends that Paragraph 9 requires written authorization, rather than verbal authorization, from the Superintendent to open mail.  Dkt. No. 80-5 at 51.  Moreover, Waters claims that Purdy did not have written or verbal authorization before he opened the mail.  *Id*.  Defendants disagree with Waters' interpretation of Paragraph 9 and claim that written authorization is only required for outgoing mail in a standard business envelope.  *See* Dkt. No. 80-14 at 14.  Waters also argues that Defendants did not have reasonable cause to retain his outgoing mail because they failed to adhere to Dir. #4422(III)(B)(22).[24]

For the purposes of this motion, it is not necessary for the Court to engage in an analysis of Dir. #4422(III)(B)(9) or (III)(B)(22) or the parties' interpretation of the language set forth

---

[23]    Paragraph III(B)(9) provides: Outgoing correspondence, except as specified in 721.3(a)(2) of Directive #4421, Privileged Correspondence, shall not be opened, inspected, or read without express written authorization from the facility Superintendent.  Dkt. No. 80-6 at 82.

[24]    Paragraph III(B)(22) provides: Outgoing correspondence that does not comply with this directive will be opened and returned to the offender.  The Correspondence Unit shall indicate the reason for return.  Dkt. No. 80-6 at 83.

27

therein.  Even assuming Purdy opened the envelope without Jacobsen's written authorization

and failed to return the documents to Waters, in violation of Paragraphs 9 and 22, those

facts, without more, do not result in a constitutional violation.  *See Long v. Crowley*, No.

09-CV-00456A, 2012 WL 1202181, at *9 (W.D.N.Y. Mar. 22, 2012) (holding that a violation

of Directive No. 4422 does not constitute a cognizable claim under § 1983); *see also Ford v.*

*Fischer*, No. 9:09-CV-723, 2011 WL 856416, at *6 (N.D.N.Y. Jan. 31, 2011) (holding that a

violation of Dir. #4422 does not state a claim for a constitutional violation under Section

1983).  To establish a First or Fourth Amendment violation, Waters must prove that

Defendants lacked "good" or "reasonable" cause to open, inspect, and confiscate his mail.

See Long, 2012 WL 1202181, at *9.

Construing Waters' submissions liberally, he suggests that Purdy acted without just

cause and maliciously because he failed to return the correspondence with the appropriate

facility form and/or paperwork.  Waters argues that, if there was a discrepancy with outgoing

mail, facility personnel were required to attach a facility form to the correspondence and

return it to the inmate.  *Id.* at 46.  To illustrate that policy, Waters provided Defendants with a

document, dated December 21, 2017, from the Wallkill Correctional Facility - Mail Room.[25]

Dkt. No. 80-3 at 50; Dkt. No. 80-5 at 312.  The form indicates to an inmate that his mail or

disbursement is being returned and provides several, pre-printed reasons for the decision to

return the mail.  *Id.*  One such reason is listed as "[o]ver-sized mail must be inspected.  You

may re-submit unsealed or see C.O. at P.C."  *Id.*

The Court has reviewed the form and finds that it does not create an issue of fact as to

---

[25]        Defendants annexed a copy of the form to the motion.

whether Defendants' violated Waters' Fourth Amendment rights when they confiscated Waters' January 2016 correspondence.  The form is dated two years after the January 2016 incident and, as Waters concedes, it does not pertain to his January 2016 correspondence. Dkt. No. 80-5 at 47, 311; *see Kavowras v. New York Times Co.*, 132 Fed. App'x 381, 383, n.2 (2d Cir. 2005) (reasoning that a document that does not relate to the relevant period or dispute at hand is insufficient to create a genuine issue of fact).

Liberally construing the Second Amended Complaint, Waters further asserts that Defendants' decision to seize his mail violated his Fourth Amendment rights because Defendants misrepresented the contents of the envelope as contraband.  In his deposition, Waters testified that the document was a "manuscript" with "names, incidents, involving staff that had engaged in criminal conduct while on the job, and it was other events related to my incarceration."  Dkt. No. 80-5 at 34.  As the parties concede, the subject material was confiscated and subsequently destroyed.  Thus, the Court is precluded from rendering an opinion as to whether the document constituted contraband.  However, the record evidence before the Court contradicts Waters' deposition testimony and belies his argument.  First, Waters conceded that he failed to adhere to facility rules when he attempted to mail an oversize envelope, without previously presenting it for inspection.  Dkt. No. 80-5 at 34, 39-40. Second, during the disciplinary hearing, Waters did not describe the contents of the envelope as a "manuscript" related to his own conditions of confinement.  Rather, he testified that he attempted to mail "paperwork" to Ms. Sheard because, "she asked for it" during a telephone conversation.  Dkt. No. 80-2 at 273-275.  Waters stated that Ms. Sheard asked, "will you do me a favor if you could draft something for me," and testified, "I drafted for her and I'm sending it to her."  *Id*. at 276.  Waters admitted to Huckeba that he was on the telephone with

29

another inmate's family member, which Huckeba noted was, "an illegal phone call." *Id.* at

285.  When Huckeba asked, "the information in the packet again[,] what was that," Waters

responded, "[t]he papers" are "legal arguments, they're points." *Id.* at 286.  Waters then

conceded that the envelope was not stamped "legal mail." *Id.*   Third, in further support of

the argument that the contents of the envelope were legal in nature, Defendants provided a

copy of Waters' Inmate Claim Form.  Dkt. No. 80-2 at 293.  On the form, Waters wrote, "[o]n

January 11, 2016 twenty-three pages of written material of a legal nature was confiscated[.]"

*Id.*

Based upon the totality of the evidence, the Court finds that Defendants acted with good

cause and in the interest of prison security when they opened and confiscated a sealed,

over-sized envelope addressed to the family member of another inmate, containing legal

materials, that was not produced for inspection prior to mailing or marked as "legal mail."

*See Long*, 2012 WL 1202181, at *9 (awarding summary judgment dismissing the plaintiff's

First Amendment claim reasoning that the defendants had "good or reasonable" cause,

based on a violation of Directive No. 4422, and considering legitimate security concerns, to

open the outgoing mail); *see Minigan*, 977 F.Supp. at 610 (awarding summary judgment

dismissing First Amendment claim and holding that the defendants acted "in the interest of

ensuring compliance with legitimate prison regulations and directives regarding unauthorized

inmate correspondence," to inspect and open the plaintiff's non-privileged outgoing mail that

had insufficient postage and was addressed to his wife); *see Lebron v. Selsky*, No. 9:05-CV-

172 (GTS/DRH), 2009 WL 6312275, at *11 (N.D.N.Y. Sept. 11, 2009) (dismissing First and

Fourth Amendment claims reasoning that the plaintiff's "documented failure to adhere to

facility correspondence rules" resulted in valid safety concerns); see *Dillhunt*, 2009 WL 4985477, at *10  ("[S]ince the surveillance of plaintiff's outgoing mail was instituted upon reasonable suspicion, that search and resulting seizure would also pass muster under the Fourth Amendment.").

Based upon the record, Defendants have articulated legitimate penological objectives for the prevention of unauthorized inmate communications, such as protecting against the exchange of contraband.  *See Minigan*, 977 F.Supp. at 610 (holding that interference with the plaintiff's non-privileged letter addressed to his wife was "within constitutional bounds"). Additionally, the evidence before the Court establishes that the January 2016 occurrence was an isolated incident and Waters has not come forth with evidence that the opening of his non-privileged mail resulted in any harm.  *See id.* (finding additional support for summary judgment because "there is nothing in the record to suggest that this single incident of opening plaintiff's nonprivileged mail outside of his presence caused him to suffer any damage.").

Accordingly, the undersigned recommends granting Defendants' motion for summary judgment and dismissal of Waters' Fourth Amendment and First Amendment freedom of speech claims.

### C.  First Amendment - Retaliation

Defendants move for summary judgment and dismissal of Waters' retaliation claims. *See* Dkt. No. 80-14 at 16-28.  A cognizable retaliation claim pursuant to 42 U.S.C. § 1983 lies when prison officials take an adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First

Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To state a prima facie claim pursuant to 42 U.S.C. § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action–in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).

The causal connection between the protected conduct and adverse action "must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). "In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior

32

good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Id*. (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995). With respect to proximity, a plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty*., 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart*, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

If the plaintiff carries the burden of establishing a prima face case, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy*, 429 U.S. at 287. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the

requisite nexus between any protected activity and the adverse action complained of, a

defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation

claims. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds,*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

Defendants do not dispute that Waters engaged in protected activity or that he suffered

adverse actions.[26]  *See* Dkt. No. 80-14 at 16-28; *see also Johnson v. Eggersdorf*, 8 Fed.

App'x 140, 144 (2d Cir. 2001) (it is well-settled that filing a grievance or a lawsuit is

constitutionally protected conduct); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996);

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995).

### 1.  Claims Related to January 2016 MBR, Disciplinary Hearing, and Appeal

Waters alleges that Purdy issued the misbehavior report and Huckeba and Niles

rendered their disciplinary determinations with retaliatory animus after reviewing the contents

of his manuscript.  *See* Dkt. No. 80-5 at 204, 209-210, 326.  Defendants argue that Waters

has not established a causal connection between protected conduct and Defendants' actions

and further, that Defendants would have taken the same action, absent the protected

conduct.  *See* Dkt. No. 80-14 at 20-22, 24-25.

The record before the Court does not include evidence suggesting that Waters filed any

grievances at Wallkill C.F. prior to January 2016.  However, it is undisputed that Waters

engaged in protected conduct when he filed approximately twenty-three actions in federal

and state courts in New York, prior to this action. *See* Dkt. No. 32 at 5-7.  While the filing of

the misbehavior report and guilty disciplinary determination constitute adverse actions, the

---

[26]      From January 2016 until September 2016, Waters filed ten grievances related to his conditions
of confinement at Wallkill C.F.  *See generally*, Dkt. No. 80-2 through 80-4.

record lacks evidence connecting those actions to the prior lawsuits.  Purdy, Huckeba, and Niles were not named as defendants in any prior lawsuit and the record lacks evidence establishing that Purdy, Huckeba, or Niles were aware of any of the aforementioned actions in January 2016.

"As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)).  On January 20, 2016, Waters filed a grievance claiming that "his outgoing mail was opened in violation of Directive #4422."  Dkt. No. 80-2 at 247-249, 253.  The grievance does not include any reference to the disciplinary proceeding, Huckeba, or Niles or evidence that Huckeba or Niles was aware of the January 20, 2016 grievance.

Irrespective of the lawsuits and grievances, Waters claims that Purdy, Huckeba, and Niles decided to retaliate against him after they reviewed the contents of the January 2016 envelope.  The Court finds Waters' allegations impermissibly vague, conclusory, and entirely unsupported by competent, admissible facts.  During his deposition, Waters testified that the "manuscript" contained allegations against "officers" at Wallkill C.F.  Dkt. No. 80-5 at 34, 77.  While Waters claims that Jacobsen was identified in the manuscript, *see* Dkt. No. 80-5 at 93, there is no evidence, or even an allegation, that Purdy, Huckeba, or Niles was named in the manuscript.  As discussed *supra*, Waters cannot satisfy the third element of his retaliation claim absent evidence of a connection between the defendants and the individuals referenced in his manuscript.  *See Flood v. Cappelli*, No. 18-CV-3897, 2019 WL 3778736, at *8 (S.D.N.Y. Aug. 12, 2019).

In support of the motion, Purdy, Huckeba, and Niles provided Declarations swearing that

35

their decisions were not based on any past illegal activity, grievances, speech, or legal work

contained in the January 2016 envelope.  Dkt. No. 80-9 at ¶ 17; Dkt. No. 80-11 at ¶9; Dkt.

No. 80-12 at ¶ 14.  As discussed in Part III(B) *supra*, the contents of the January 2016

envelope are not part of the record and the parties offer dramatically different interpretations

of the documents.  Indeed, Waters' sworn testimony regarding the contents of the envelope

is conflicting.  Mere speculation that a defendant acted with retaliatory animus, without more,

does not support a claim for retaliation.  *See Dorsey v. Fisher*, 468 Fed. App'x 25, 27 (2d Cir.

2012).   Accordingly, the record before the Court lacks evidence from which a rationale

factfinder could conclude that Waters established the third element of his retaliation claims

against Purdy, Huckeba, and Niles related to the January 2016 MBR and disciplinary

hearing/appeal.[27]  Therefore, it is recommended that Defendants' motion for summary

judgment and dismissal of Waters' retaliation claim against Purdy, Huckeba, and Niles,

related to the January 2016 MBR and disciplinary hearing/appeal, be granted.

### 2.  Claims Related to Inmate Records

Waters contends that Jacobsen and Niles denied his requests for a copy of Jeudy's

records in retaliation for prior grievances, lawsuits, the contents of the envelope he attempted

to mail in January 2016, and because Waters sought Jeudy's records "for litigation

purposes."  Dkt. No. 80-5 at 21-21, 77, 337-38.  Defendants argue that Jacobsen and Niles

would have denied Waters' request, absent the protected conduct.  Dkt. No. 80-14 at 25.

If the plaintiff satisfies the burden of showing that issues of fact exist as to whether the

protected conduct was a substantial motivating factor in the prison officials' actions, "the

---

[27]     Because the Court concludes that no issue of fact exists related to causation, the Court declines
to address whether Niles would have taken the same action, absent the protected conduct.

burden shifts to the defendants to show that they would have taken the action even in the absence of the plaintiff's protected conduct—that is, even if they had not been improperly motivated.' " *Davidson v. Chestnut*, 193 F.3d 144, 148–49 (2d Cir. 1999) ("if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail[]") (citation omitted).  "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994)).

On February 25, 2016, Jacobsen denied Waters' request for Jeudy's records and explained:

> Based on the fact that the misbehavior report you received was
> for possessing another inmates papers without permission, I
> am not inclined for you to be approved to possess inmate
> Jeudy's papers or any other inmates papers.

Dkt. No. 80-3 at 161.

In support of the motion, Jacobsen provided a Declaration and explained that she denied the request because inmates are not permitted to possess other inmate's records.  Dkt. No. 80-6 at ¶ 31.  Moreover, Jacobsen opined that Waters could have been disciplined for possessing Jeudy's records if a random cell search uncovered the documents. *Id*.

On August 10, 2016, Niles denied Waters' renewed request for Jeudy's records in a decision that reads, in its entirety:

> I am writing in response to your letter dated 8/8/2016
> requesting permission to possess inmate Jeudy, T. 10A5083

37

disciplinary paperwork.

Your request is being denied.

Dkt. No. 80-3 at 163.

In support of the motion, Niles provided a Declaration and swears that, he responded to Waters' second request because Jacobsen was not in the facility on August 10, 2016.  Dkt. No. 80-11 at ¶ 15.  Niles explains that he denied the request because, "the Superintendent had already considered and denied the same request and Plaintiff's August 8 letter did not offer any new facts which would justify disclosure of another inmate's disciplinary records." *Id*.

In a third attempt to obtain the misbehavior report, Jeudy forwarded a request to Jacobsen, on Waters' behalf.  Dkt. No. 80-3 at 165; Dkt. No. 80-6 at ¶ 31.  Jeudy provided an Affidavit whereby he authorized two Judges of the Northern District "or any legal representative of any plaintiff involved in litigation in such court" to have access to his disciplinary records.  Dkt. No. 80-3 at 165.  The Affidavit did not authorize the release of the records to Waters.  On August 23, 2016, Jacobsen issued a memorandum to Jeudy denying the request but advising that, "Mr. Waters attorney can ask for the documents he may need." Dkt. No. 80-6 at 101.  Jacobsen avers that, despite this authorization, she did not receive a request for the records from any attorney.  *Id*. at ¶ 31.  During his deposition, Waters testified that he did not ask an attorney to obtain the documents on his behalf, "because the statute doesn't say anything about an attorney."  Dkt. No. 80-5 at 108.

Because the record before the Court, even when construed most favorably towards Waters, lacks evidence undermining Jacobsen's and Niles' legitimate, non-retaliatory reason for denying Waters' requests for Jeudy's MBR, the Court recommends that Defendants'

motion for summary judgment and dismissal of the retaliation claims against Jacobsen and Niles, related to Jeudy's MBR, be granted. *See Nieblas v. Ricci*, No. 03-CV-6225, 2008 WL 163686, at *7 (W.D.N.Y. Jan. 16, 2008) (granting summary judgment where the plaintiff failed to submit admissible proof to counter the defendant's evidence that same actions would have been taken against him in the absence of the alleged retaliation).

### 3. Claims Related to Law Library Position

Construing Waters' submissions liberally, he argues that Wlodkowski and Niles discharged him from his position in the law library, in January 2016, in retaliation for filing grievances, lawsuits, and the contents of the January 2016 envelope. Defendants argue that Wlodkowski and Niles were not personally involved in the decision to remove Waters from his position in the law library and thus, the retaliation claims must be dismissed. *See* Dkt. No. 80-14 at 23-25. While Defendants have failed to present any further argument in support of summary judgment, upon review of the record, the Court finds that Waters has not established a prima facie retaliation claim.

The record lacks evidence establishing that Wlodkowski or Niles was a defendant, or aware of, Waters' lawsuits filed prior to January 2016. Moreover, the only grievance Waters filed, before he was discharged from the law library, was the January 20, 2016 grievance related to his outgoing mail. Wlodkowski and Niles are not mentioned or referenced in that grievance and the record lacks evidence establishing that Wlodkowski or Niles was aware of the January 20, 2016 grievance or how and why the January 20, 2016 grievance motivated them to remove Waters from the law library. Additionally, there is no evidence that Wlodkowski or Niles was named or identified in the documents enclosed in the January 2016 envelope. Accordingly, for the reasons set forth in Part III(C)(1), Waters cannot satisfy the

third element of his retaliation claim absent evidence of a connection between the defendants and the lawsuits, grievances, or individuals referenced in the January 2016 mailing. *See Flood*, 2019 WL 3778736, at *8.

Thus, the Court recommends that Defendants' motion be granted on this ground.[28]

### 4. Claims Related to February 2017 MBR and Hearing[29]

Waters claims that Wlodkowski acted with retaliatory animus when he issued the February 2017 MBR because Waters previously filed a grievance against Wlodkowski. *See* Dkt. No. 80-5 at 213. Waters also alleges that Purdy retaliated against him when found him guilty after a disciplinary hearing because Waters successfully appealed Purdy's disciplinary determination related to the January 2016 MBR. *See id.* at 208. In response, Defendants argue that Waters has not established a causal connection between protected activity and Wlodkowski's actions.[30] *See* Dkt. No. 80-14 at 23-24. Defendants also contend that Wlodkowski and Purdy would have taken the same actions, despite the protected conduct. *See id*. at 21, 23-24.

On January 27, 2016, Waters filed a grievance (WK-11321-16) complaining that he was removed from the law library program assignment in violation of policy, procedures, and standards for programming. Dkt. No. 80-9 at 56-57. Wlodkowski was assigned to

---

[28]    Because the Court recommends dismissal for failure to state a prima facie claim, the Court declines to address Defendants' arguments related to personal involvement.

[29]    As discussed *supra*, it is recommended that Defendants' motion for summary judgment and dismissal of the retaliation claims related to the February 2017 MBR and the February 2017 disciplinary hearing for failure to exhaust be granted. Alternatively, if the District Judge were not to adopt or confirm the undersigned's recommendation for dismissal on the basis of exhaustion, the undersigned addresses the merits of Plaintiff's claim.

[30]    Defendants do not dispute that issues of fact exist with respect to whether Purdy acted with retaliatory animus when he issued his disciplinary determination in February 2017. *See* Dkt. No. 80-14 at 21-22.

investigate the grievance. *Id.* at 58. One year later, in February 2017, Wlodkowski issued a

misbehavior report. The existence of this grievance, without more, does not create an issue

of fact to warrant a denial of Defendants' motion. *See Butler v. Raytel Med. Corp.*, 150 Fed.

App'x. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse

action is insufficient to support an inference of a causal relationship). In an attempt to

establish retaliatory animus, Waters claims that Wlodkowski waged a "campaign of

harassment" against him. *See* Dkt. No. 80-5 at 125-128. However, upon review of the

record, the Court finds no evidence of any specific act from January 2016 until February

2017 that supports Waters' claim.

Even assuming Waters established a viable retaliation claim against Wlodkowski and

Purdy, Defendants argue that they would have taken the same actions in the absence of any

alleged retaliatory motive.

"Once [the plaintiff] produce[s] evidence sufficient to raise a material question of fact as

to retaliation, the burden shift[s] to [the defendant] to demonstrate through admissible

evidence that the challenged actions would have occurred in any event." *Bennett v. Goord*,

343 F.3d 133, 139 (2d Cir. 2003). "The defendant can meet this burden by demonstrating

that there is no dispute that the plaintiff 'committed the most serious, if not all, of the

prohibited conduct charged in the misbehavior report.' " *Gayle v. Gonyea*, 313 F.3d 677, 682

(2d Cir. 2002) (citations omitted).

Wlodkowski avers that, on February 16, 2017, he inspected Waters' paperwork and

discovered that Waters was performing legal work for another inmate, without prior

authorization. Dkt. No. 80-8 at ¶ 10. The February 2017 MBR charged Waters with three

offenses including providing unauthorized legal assistance and possessing contraband. Dkt.

41

No. 80-3 at 184.  During the disciplinary proceeding, Waters conceded that the paperwork in

question was entitled "affidavit".  Dkt. No. 80-4 at 5-6.  Waters testified:

> Waters:     So what I did was I created a document.
>
> Purdy:      Okay.
>
> Waters:     Three pages, I left it on the countertop, I went
>             down to movement, he went through my
>             paperwork while I wasn't there.  I came back, he
>             asked me what are you working on.  I told him
>             what I was working on.  He said let me see those
>             papers like he said in the thing.  I showed them
>             to him.
>
> Purdy:      Okay.
>
> Waters:     He confiscated it, and he wrote me a ticket.
>             Saying that there was an affidavit and it is not an
>             affidavit.
>
> Purdy:      But that is what you titled it as.
>
> Waters:     That's what I titled it because I knew that he was
>             going to go through my paperwork while I was
>             gone.

Dkt. No. 80-4 at 7-8.

Waters testified that he intentionally created the "fictitious" document because he knew

that Wlodkowski would read his paperwork.  Dkt. No. 80-4 at 8-13.  The entire document was

read into the record at the hearing.  *Id*. at 13.  The first sentence of the document read,

"Simon Carter being duly sworn deposes and says [. . .]."  *Id*.  The document contained a

summary of issues Inmate Carter encountered with his legal mail while he was confined at

Rikers' Island.  *Id*.  Waters was subsequently found guilty of providing unauthorized legal

assistance and possessing contraband.  Dkt. No. 80-3 at 181.

Regardless of his motivation, it is clear from the record that Waters admitted to creating

a legal document for another inmate, which was the basis for the February 2017 MBR.  Thus, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report."  *See Gayle*, 313 F.3d at 682.  Based upon the record before the Court, Defendants have presented sufficient evidence supporting Wlodkowski's decision to issue the misbehavior report and Purdy's disciplinary determination to suggest that they would have imposed the same punishment, regardless of the protected conduct.  *See Waters v. Prack*, No. 9:13-CV-1437 (LEK/DEP), 2017 WL 1239642, at *8 (N.D.N.Y. Feb. 24, 2017) (citing *Graham v. Henderson*, 89 F.3d at 75, 79 (2d Cir. July 11, 1996) ("[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." )).  Waters has not submitted any competent proof in response.

Accordingly, the Court recommends granting Defendants' motion, on this ground.

### 5.  Claims Against Jacobsen[31]

### a.  Freedom of Speech

Waters claims that Jacobsen was motivated to retaliate against him when she directed Purdy to open his mail because she was aware of his prior civil rights complaints.  *See* Dkt. No. 80-5 at 21-27.  Defendants move for summary judgment and dismissal of this retaliation claim arguing that Waters failed to establish the third element of a retaliation claim.  *See* Dkt. No. 80-14 at 26.  Defendants argue that Jacobsen was not aware of the details surrounding Waters' July 2015 lawsuits when she authorized Purdy to open Waters' mail in January 2016. *See id.*

---

[31]    Defendants do not present any argument in support of summary judgment and dismissal of Waters' retaliation claims against Jacobsen based upon the application of DOCCS' Rules 113.23 and 180.17.

In July 2015, while confined at Wallkill C.F., Waters filed two complaints in the Northern District asserting Section 1983 claims arising out of his confinement in DOCCS' custody at Coxsackie Correctional Facility and Barehill Correctional Facility. *See Waters v. Melendez, et al.*, No. 9:15-CV-0805 (TJM/CFH), Dkt. No. 1 ("*Waters I*"); *see also Waters v. Gallagher, et al.*, No. 9:15-CV-0804 (LEK/DEP), Dkt. No. 1 ("*Waters II*"). While a six month gap between protected conduct and adverse action suggests a causal connection, evidence of temporal proximity, without more, is insufficient to defeat a motion for summary judgment. *Williams v. King*, 763 Fed. App'x 36, 38–39 (2d Cir. 2019). Waters alleges that Jacobsen was aware of the 2015 civil rights complaints because she received the in forma pauperis applications, with notice of the actions and fees from the Northern District. Dkt. No. 80-5 at 22-27. Waters also claims that Jacobsen mentioned his prior lawsuit(s) during a conversation in the law library. *Id*. at 23-25.

Even assuming that these allegations are true, Jacobsen was not a defendant in Waters' prior lawsuits or actions. *Id*. at 27. Moreover, the record lacks evidence establishing how or why Jacobsen would be motivated to retaliate against Waters due to any prior lawsuit that did not involve Wallkill C.F. officers or staff. For the reasons set forth in Part III(C)(1) *supra*, the record evidence does not establish a causal connection between Waters' protected conduct and Jacobsen's directive to Purdy. *See Hare*, 2011 WL 1453789, at *4. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of the retaliation claim against Jacobsen, related to Waters' mail in January 2016, be granted.

### b. Facility Claim

Waters contends that Jacobsen retaliated against him when she denied his facility claim

due to his prior lawsuits, grievances, and the contents of the envelope he attempted to mail in January 2016.  *See* Dkt. No. 80-5 at 77.  Defendants do not dispute that issues of fact exist as to whether Jacobsen acted with retaliatory animus when she denied Waters' facility claim.[32]  Defendants argue however, that Jacobsen's decision to deny the claim were "for reasons unrelated to retaliation."  *See* Dkt. No. 80-14 at 27-28.

Jacobsen denied Waters' claim for $5,000.00 for "twenty-three pages of written material of a legal nature confiscated by Lt. Purdy" because Waters, "failed to provide documentation to prove value.  Also the documents were not his and were part of a disciplinary hearing." Dkt. No. 80-2 at 293-294.  In support of the motion, Jacobsen provided a Declaration and swears that the claim was denied because Waters failed to provide evidence to support the value of the papers and further, Waters was "substantially responsible for the loss or damage, specifically because it was caused by a violation of rules."  Dkt. No. 80-6 at ¶ 23. Jacobsen denied the appeal because Waters was "kiting" inmate Sheard's legal work, the documents were confiscated, and subsequently used as evidence in the disciplinary hearing. *Id*.

Based upon the record before the Court, Jacobsen has presented sufficient evidence establishing that she would have taken the same action against Waters, in the absence of protected conduct.  Waters has not submitted any competent proof in response. Accordingly, the Court recommends granting Defendants' motion, on this ground.

### D.  Declaratory and Injunctive Relief

---

[32]    From January 2016 until September 2016, Waters filed five grievances that were forwarded to Jacobsen, in her position as Superintendent, on appeal.  *See* Dkt. No. 80-2 at 253; Dkt. No. 80-3 at 132, 146, 158, 176.

Defendants move for dismissal of Waters' claims for declaratory and injunctive relief against Annucci, in his official capacity, arguing that the requests have been rendered moot by his release from DOCCS' custody.  *See* Dkt. No. 80-14 at 28-31.

*In Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under this doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective."  *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv*., 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).  "[I]n order to warrant the court's consideration, the plaintiff must be seeking prospective relief from an 'ongoing violation of federal law' which affects him directly, as opposed to others." *Ruggiero v. Brian Fischer, Comm'r, No.* 15-CV-00962, 2017 WL 6999859, at *2 (W.D.N.Y. Aug. 25, 2017), *report and recommendation adopted sub nom*., 2018 WL 488949 (W.D.N.Y. Jan. 20, 2018) (citations omitted).

Here, Waters' release from DOCCS' custody moots his claim for prospective injunctive and declaratory relief.  *Ciaprazi v. Jacobson*, 719 Fed. App'x 86, 87 (2d Cir. 2018) (dismissing released prisoner's claim for injunctive relief because "he cannot benefit from a reversal of [. . .] a prison dental policy"); *see also Collins v. Goord*, No. 05-CV-0039, 2009

46

WL 1796550, at *3 (W.D.N.Y. June 24, 2009) (holding that the plaintiff's release from prison moots his interest in either an injunction or a declaration regarding his conditions of confinement); *Henrius v. Cty. of Nassau*, No. 13CV1192, 2016 WL 1171598, at *3 (E.D.N.Y. Mar. 24, 2016) (dismissing claims against Annucci reasoning that because the plaintiff was no longer imprisoned, "the prospective injunction 'would afford no legally cognizable benefits to him' and thus, that claim for injunctive relief is moot") (citations omitted).

Accordingly, the Court recommends granting Defendants' motion on this ground.

### E. Fourteenth Amendment - Conditions of Parole

Defendants move for summary judgment and dismissal of the Fourteenth Amendment due process claims against Annucci, Jacobsen, and Levandoski, related to the recommendations for conditions of Waters' parole.

### 1. Annucci and Jacobsen

Defendants argue that Annucci and Jacobsen were not personally involved in the recommended conditions of parole.  *See* Dkt. No. 80-14 at 34.  "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.  *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  In other words, supervisory officials may not be held liable merely because they held a position of authority.  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Prior to *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[33]

"A prison official's position within the prison hierarchy is insufficient to establish the official's personal involvement in the alleged constitutional deprivation."  *Bloodywone v. Bellnier,* 778 F. App'x 52, 53 (2d Cir. 2019) (citing Colon, 58 F.3d at 874).

### a. Annucci

---

[33]    The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]") (citing *Grullon*, 720 F.3d at 139).

In support of the motion, Annucci provided a Declaration and avers that he had no

personal involvement in the recommendations for special conditions for parole.  Dkt. No. 80-

7 at ¶ ¶ 4, 5.  Annucci states that recommendations of that nature are made by the ORC or

Supervising ORC.  *Id*. at ¶ 4.

During Waters' deposition, he was asked questions regarding Annucci's involvement in

his parole conditions, and provided the following responses:

> Q.    Okay.  Do you have personal knowledge that Defendant Annucci was involved in the parole recommendation which was submitted to the board?
>
> A.    No.
>
> Q.    Do you have any personal knowledge that Defendant Annucci was involved in any way in making the determination - - the parole determination that was ultimately handed down?
>
> A.    Only through the policies and procedures by the board - - by the - - at the then Department of Corrections and Community Supervision, that's the only way.
>
> Q.    It's a supervisory claim, he's the head of DOCCS - -
>
> A.    Right.
>
> Q.    - - therefore, you're making the claim against him?
>
> A.    Right.

Dkt. No. 80-5 at 169-170.

Construing the pro se plaintiff's testimony to raise the strongest arguments, Waters

argues that Annucci was personally involved in the decisions related to the conditions of

parole based upon the third *Colon* factor.  *See Belpasso v. Port Auth. of New York & New

Jersey*, 400 Fed. App'x 600, 601 (2d Cir. 2010) (citation omitted).

49

The third *Colon* category provides for personal involvement where "the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873.  "A policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the 'violative practice is persistent and widespread,' and if the acts of subordinate employees 'imply the constructive acquiescence of senior policy-making officials.' " *Lipton v. Cty. of Orange*, 315 F.Supp.2d 434, 453 (S.D.N.Y. 2004).

Here, Waters' allegations regarding the "polices and procedures" are conclusory and unsupported by the record.  Waters has not provided sufficient evidence of other instances of constitutional violations and Annucci's knowledge of them to permit a jury to find that Annucci was personally involved in decisions or recommendations related to the special conditions of parole.  *See Casey v. Brockley*, No. 9:13-CV-01271 (DNH/TWD), 2018 WL 1399244, at *9 (N.D.N.Y. Feb. 16, 2018) (awarding summary judgment in favor of the superintendent because the plaintiff failed to provide evidence of similar events and "sheds no light on [the Superintendent's] actions or conduct in creating or permitting a policy or custom").  There is no evidence that Annucci created a policy or custom, or allowed the continuation of an unconstitutional policy to continue.  Indeed, the record evidence does not suggest that Annucci was even aware of Waters' claims or that he acted, or failed to act, once placed on notice of the allegations.  *See Haynes v. Mattingly*, No. 06-CV-1383, 2014 WL 4792241, at *9 (S.D.N.Y. Sept. 24, 2014), *aff'd* (Oct. 27, 2015) (finding no issue of fact related to the plaintiff's claim of personal involvement, pursuant to the third *Colon* factor, against OCFS Commissioner).

Thus, the Court recommends granting Defendants' motion summary judgment on Waters' Fourteenth Amendment claim against Annucci related to the special conditions of parole.

### b. Jacobsen

In support of the motion, Jacobsen provided a Declaration and avers that she had no involvement in the recommendation for special conditions of parole release. Dkt. No. 80-6 at ¶ 40. Waters concedes that Jacobsen did not prepare the recommendations and was not on the Parole Board. Dkt. No. 80-5 at 168. However, construing the submissions to raise the strongest arguments, Waters claims that Jacobsen was personally involved in the decisions related to the conditions of parole based upon the second *Colon* factor.

"In this circuit, it remains uncertain as to whether a supervisor may be found personally involved in an alleged constitutional violation where the only allegation is that he denied a plaintiff's grievance." *Thon v. Grimshaw*, No. 9:13-CV-0898 (GLS/DEP), 2016 WL 8671925, at *9 (N.D.N.Y. Aug. 26, 2016) (citing *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004)). District courts in this circuit have found personal involvement based on the denial of a grievance where the alleged constitutional violation complained of in the grievance was "ongoing [. . . ] such that the 'supervisory official who reviews the grievance can remedy [it] directly.' " *Burton v. Lynch*, 664 F.Supp.2d 349, 360 (S.D.N.Y. 2009) (citation omitted).

As discussed *supra*, on April 24, 2018, Waters filed a grievance seeking, *inter alia*, the suspension of the application and enforcement of Directive 9601 without a process to challenge. Dkt. No. 80-4 at 67. On May 3, 2018, the IGRC denied the grievance and Waters appealed to the Superintendent. *Id.* at 75. On May 7, 2018, Jacobsen denied Waters'

appeal reasoning:

> The grievant is seeking a change to a DOCCS practice and believes he should have been provided with a copy of Form 9601aCS.
>
> Upon investigation, Offender Rehabilitation Coordinators (ORCs) recommend conditions based on information available in an offender's record. It is the Parole Commissioners who set conditions for the Parolee.
>
> FORM 9601aCS does not state that a copy be given to the offender before his release. There is a challenge procedure in place when a condition of limiting or prohibiting contact has been imposed by Community Supervision.
>
> I see no reason to change Directive #9601 - Parental Contact Protocol - at this time.

Dkt. No. 80-4 at 76.

On May 28, 2018, Waters filed a grievance (WK-11689-18) claiming that the special conditions of parole were imposed for the purpose of harassment and retaliation. Dkt. No. 80-4 at 51. The IGRC denied the grievance noting that the "ORC completed the paperwork correctly." *Id*. at 52. Waters appealed to the Superintendent. *Id.* On June 12, 2018, Jacobsen denied the grievance reasoning:

> Upon investigation, the grievance has already requested a Directive change to #9601 - Parental Contact Protocol - because he disagrees with the recommended parole stipulations (WK 11679-18). The parole stipulations are a direct result of the information contained in the grievant's file. The grievant can FOIL the names of the commissioners who imposed the stipulations.

Dkt. No. 80-4 at 55.

In her declaration, Jacobsen claims that her decision and denial of the grievances did not involve the substance of the conditions of parole. Dkt. No. 80-6 at ¶¶ 43-44.

52

Based upon the record before the Court, Waters was still incarcerated at Wallkill C.F. when Jacobsen denied the aforementioned grievances. Thus, Jacobsen was on notice of the alleged constitutional violations and the violations were ongoing, Jacobsen was in a position to remedy the violations. Dkt. No. 80-5 at 18; Dkt. No. 80-10 at ¶ 7. Jacobsen's responses were more than "pro forma denials." *See Johnson v. Fischer*, No. 9:12-CV-0210 (DNH/TWD), 2015 WL 670429, at *8 (N.D.N.Y. Feb. 17, 2015) (concluding that the plaintiff raised a triable issue of fact that the superintendent was personally involved in the alleged constitutional violations). Accordingly, genuine issues of material fact exist regarding Jacobsen's personal involvement in the Fourteenth Amendment claims. *See White v. Fischer*, No. 9:09-CV-240, 2010 WL 624081, at *7 (N.D.N.Y. Feb. 18, 2010); *see Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2014 WL 4627108, at *11 (N.D.N.Y. Sept. 11, 2014) (finding an issue of fact as to whether defendant the superintendent was personally responsible for not remedying the issues raised in the plaintiff's grievance while the plaintiff remained confined under the same conditions).

Consequently, the Court recommends denying Defendants' motion, on this ground.

## 2. Levandoski

Defendants contend that Levandoski's recommendations were based upon legitimate state interests, and thus summary judgment and dismissal of the Fourteenth Amendment claim is appropriate. *See* Dkt. No. 80-14 at 34.

Conditions of parole must be reasonably related to a parolee's criminal history, or the State's interest and not arbitrary and capricious. *Robinson v. Pagan*, No. 05-CV-1840, 2006 WL 3626930, at *6 (S.D.N.Y. Dec. 12, 2006). "Conditions will be upheld if there is a

reasonable relationship to the parolee's prior conduct or to a legitimate government interest such as rehabilitation, the prevention of recidivism and future offenses, and protection of the public." *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at *20 (S.D.N.Y. Jan. 11, 2019) (citation omitted). "Nonetheless, a parolee may seek judicial intervention—including 'tailoring or invalidation'—where 'the condition is not related to the parolee's criminal history or to the State's interests.' " *Id*. (citation omitted). "This 'limited due process right,' which entitles a parolee to; 'conditions of parole that are reasonably related to his prior conduct or to the government's interest in his rehabilitation,' may be enforced in federal court." *Id*. (internal citation omitted); *Singleton v. Doe*, No. 14-CV-0303, 2014 WL 3110033 at *3 (E.D.N.Y. July 7, 2014) ("[T]he imposition of conditions—whether imposed prior to or subsequent to release, by the parole board or a field parole officer—must be upheld as long as they are reasonably related to a parolee's past conduct, are not arbitrary and capricious, and are designed to deter recidivism and prevent further offenses.").

"[I]t is well established that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by substantive due process." *Maldonado v. Mattingly*, No. 11-CV-1091SR, 2019 WL 5784940, at *10 (W.D.N.Y. Nov. 6, 2019) (citations omitted). "Thus, 'parole conditions that bar a parent from all contact with a child or condition such contact on a parole officer's approval implicate a fundamental liberty interest in a familial relationship, are subject to strict scrutiny, require individualized justification based on the threat posed by the defendant to the child, and require that the releasee be given an opportunity to be heard before their imposition.' " *Id*. (citation omitted).

In support of the motion, Levandoski provided a Declaration and swears that she

recommended that Waters have no contact, communication, or association, by any means, with Sharon Waters (his spouse) and Kierah Waters (his daughter), without permission from his parole officer based upon a Domestic Assault charge in 1996 and an Order of Protection, related to Sharon and Kierah Waters, that was issued on March 8, 2005 and expired one month later, on June 10, 2005. Dkt. No. 80-10 at ¶¶ 4, 5.

Upon review of the entire record, the Court finds issues of material fact as to whether the special conditions of parole are "arbitrary and capricious" precluding an award of summary judgment. First, Defendants have not presented evidence establishing that the conditions are related to the crime for which Waters was convicted - robbery. Second, Defendants have not provided evidence establishing that the "condition[s] [were] narrowly tailored to protect" Waters' daughter or his wife. The record lacks any documentary evidence related to the 1996 domestic assault charge and there is no allegation or suggestion that the twenty-year old charge, involved Sharon Waters or Kierah Waters. Indeed, Waters and Sharon Brothers were not married until 2003 and Kierah was born in October 2003. Dkt. No. 80-4 at 71. According to the record, there is no Order of Protection or any other Court Order prohibiting or limiting Waters' contact with Sharon or Kierah and the OFCS' search failed to uncover any records related to Waters. Dkt. No. 32 at 200; Dkt. No. 80-4 at 59.

Third, Defendants have not submitted evidence contradicting Waters' sworn testimony related to his relationship with his family. To wit, Waters alleges that, since he has been in DOCCS' custody, he has maintained "frequent contact, communication, and association" with his family. Dkt. No. 32 at 28. Waters' spouse and his children appeared on his correspondence and telephone lists and he provided them with financial support through his facility account. *Id*. at 32, 33. From 2006 to 2018, Waters was never classified as a

"domestic violence alert case." *Id.* at 33. Additionally, during his incarceration, Waters completed a parenting program and was assigned as a clerk to the parenting program in 2016. *Id*. at 32-33.

Finally, perhaps the most compelling fact precluding summary judgment, is that, in addition to Keiarah, Waters and his wife also share a son, Sheldon (born October 27, 2005), who lives in the same household with Sharon and Keiarah. Inexplicably, Waters is not prohibited from contacting or communicating with Sheldon. Dkt. No. 80-4 at 68; Dkt. No. 80-5 at 175.

Accordingly, issues of fact exists wherein a reasonable factfinder could conclude that Levandoski's recommendations were not reasonably related to a legitimate government interest.[34] Thus, the Court recommends denying Defendants' motion for summary judgment, on this ground. *See Maldonado*, 2019 WL 578940, at *10 (denying the defendant's motion for summary judgment related to the special conditions of parole prevented the plaintiff from contact with his children).

## F. Qualified Immunity

In the alternative, Defendants argue that they are shielded from Fourteenth Amendment liability based on the doctrine of qualified immunity.[35]

---

[34] In the Memorandum of Law submitted in support of the motion, Defendants cite to no caselaw in support of the motion for summary judgment and dismissal of this claim. The only legal analysis in the brief, related to the conditions of parole, is drawn, verbatim, from this Court's August 8, 2018 Decision and Order related to the sufficiency of the claims set forth in the Second Amended Complaint. *Compare* Dkt. No. 80-14 at 31-32 *with* Dkt. No. 31 at 11-12.

[35] To the extent that Defendants move for summary judgment and dismissal of all claims based on the doctrine of qualified immunity, I do not consider these arguments in the context of claims for which I have already recommend dismissal in this Report-Recommendation. *See Armand v. Simonson*, 12-CV-7709, 2016 WL 1257972, at *15 (S.D.N.Y. Mar. 30, 2016) ("[b]ecause the Court dismisses Plaintiff's claim against Peterson, there is no need to consider whether she may also be entitled to qualified immunity."); *see also Posr v. City of New York*, 10-CV-2551, 2013 WL 2419142, at *10, n.8 (S.D.N.Y. June 4, 2013) ("Because [the defendant] did

Qualified immunity shields federal and state officials from suit " 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.' " *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "A right is 'clearly established' if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Beckles v. City of New York*, 492 Fed. App'x 181, 182 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: " '(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful.' " *Phillips v. Wright*, 553 Fed. App'x 16, 17 (2d Cir. 2014) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)).  "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Doe v. Lima*, 270 F.Supp.3d 684, 710 (S.D.N.Y. 2017) (citations omitted), *aff'd sub nom*. *Doe v. Cappiello*, 758 Fed. App'x 181 (2d Cir. 2019).

Here, the record contains genuine issues of material fact as to the Fourteenth Amendment due process claims against Jacobsen and Levandoski.  As such, the first prong of the analysis has been met.

---

not violate [the] [p]laintiff's [constitutional] rights, there is no need to consider if [the defendant] is entitled to qualified immunity."), *aff'd sub nom. Posr v. Ueberbacher*, 569 Fed. App'x 32 (2d Cir. 2014).

With respect to the second prong, it is well established that parole conditions may not be applied in an arbitrary and capricious manner and further, that a parent has a fundamental liberty interest in maintaining a relationship with his or her child. *See Doe v. Lima*, 270 F.Supp.3d 684, 712 (S.D.N.Y. 2017) (reasoning, in a case involving parental relationships, that "defendants may establish qualified immunity only if, on the particular facts before them, officers of reasonable competence could disagree' on the legality of the actions at issue"), *aff'd sub nom*. *Doe v. Cappiello*, 758 Fed. App'x 181 (2d Cir. 2019; *Yunus v. Robinson*, No. 17-CV-5839, 2019 WL 168544, at *19 (S.D.N.Y. Jan. 11, 2019) (citation omitted).

In this case, the Court is not presented with clear evidence that qualified immunity applies. From the record before the Court, Levandoski's recommendations do not appear to be justified or tailored to Waters' circumstances. The conditions imposed are indefinite in length and, without explanation, the restrictions do not encompass his son. On the basis of the record before it, the Court cannot find that these decisions are entitled to the protections of qualified immunity. *See Doe,* 270 F.Supp.3d at 712 (denying qualified immunity where the officials imposed a blanket restriction and admittedly made no attempt to tailor the restriction to the plaintiff's circumstance); *see also Ennis v. Annucci*, No. 5:18-CV-0501 (GTS/TWD), 2019 WL 2743531, at *7 (N.D.N.Y. July 1, 2019) (denying motion to dismiss on the doctrine of qualified immunity on claim that the defendants violated the plaintiff's due process rights by imposing a family contact condition without considering less-restrictive alternatives).

Therefore, the Court recommends denying Defendants' motion, on this ground.

### III.  CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

58

**RECOMMENDED**, that Defendants' motion for summary judgment and dismissal (Dkt.

No. 80) be **GRANTED** as to Plaintiff's:

a. retaliation claims against (i) Wlodkowski related to the February 2017 MBR; and (ii)

Purdy related to the February 2017 disciplinary hearing based upon Plaintiff's failure to

exhaust administrative remedies; and

b. First Amendment Freedom of Speech and Fourth Amendment claims against

Jacobsen and Purdy; and

c. First Amendment retaliation claims: (i) against Purdy related to the January 2016

MBR; (ii) against Huckeba; (iii) against Niles; (iv) against Wlodkowski and Purdy

related to the February 2017 MBR and February 2017 disciplinary hearing[36]; and (v)

against Jacobsen related to the decision to open Waters' mail in January 2016,

Plaintiff's request Jeudy's records, and Plaintiff's facility claim; and

d. claims for injunctive and declaratory relief against Annucci; and

e. Fourteenth Amendment due process claims against Annucci related to conditions of

parole; and it is further

**RECOMMENDED**, that Defendants' motion (Dkt. No. 80) be **DENIED** as to:

a. Plaintiff's Fourteenth Amendment due process claim against Annucci for failure to

exhaust administrative remedies; and

b. Plaintiff's Fourteenth Amendment due process claims against Jacobsen and

Levandoski; and

c. the issue of qualified immunity; and it is further

---

[36]     This is an alternative recommendation, should the District Judge decline to adopt the
undersigned's recommendations related to exhaustion.

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules; and it is further

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[37] days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

DATED:  February 13, 2020

Miroslav Lovric
U.S. Magistrate Judge

---

[37]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(c).